**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**

| | | |
|---|---|---|
| ALUMINUMSOURCE, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No.: N18C-07-231 EMD CCLD |
| v. | ) | |
| | ) | |
| LLFLEX, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**DECISION AFTER TRIAL**

Thad J. Bracegirdle, Esquire, Bayard, P.A., Wilmington, Delaware, Elliot Richardson, Esquire, Michele D. Dougherty, Esquire, Ryan D. Gibson, Esquire, Korey Richardson LLC, Chicago, Illinois, *Attorneys for Plaintiff AluminumSource, LLC*

Benjamin A. Smyth, Esquire, McCarter & English, LLP, Wilmington, Delaware, Andrew Gold, Esquire, Erica Gomer, Esquire, Akerman LLP, Fort Lauderdale, Florida, *Attorneys for Defendant LLFlex, LLC*

**DAVIS, J.**

## I.     INTRODUCTION AND PROCEDURAL BACKGROUND

This is a civil action assigned to the Complex Commercial Litigation Division of the Court. The claims arise in connection with the Membership Unit Purchase Agreement ("MUPA"). Plaintiff AluminumSource, LLC ("Aluminum") alleges that Oracle Flexible Packing, Inc. ("Oracle" or "LLFlex")[1] made several misrepresentations in the Estimated Working Capital statement and that these misrepresentations damaged Aluminum. Aluminum also claims that Oracle breached the contract by withholding annealing racks and the full-time

---

[1] The Court will generally refer to Defendant as Oracle when describing pre-sale conduct or when it is the party to a particular agreement.

services of Jack White. Oracle is the predecessor by merger of Defendant LLFlex, LLC ("LLFlex").[2] LLFlex asserts a counterclaim for breach of the MUPA.

Aluminum filed its Complaint against Oracle on July 24, 2018. The Court granted a motion to dismiss without prejudice on January 10, 2019. Aluminum then filed an Amended Complaint on January 28, 2019. The Amended Complaint contained two claims for relief: (i) Fraud in the Inducement (Count I); and (ii) Breach of Contract (Count II). On February 12, 2019, the Court denied Oracle's second motion to dismiss on the record. The Court granted Aluminum's motion to substitute LLFlex for Oracle as the real party of interest on April 18, 2019. On February 27, 2019, LLFlex filed it answer to the Amended Complaint.[3] LLFlex also asserted a counterclaim for breach of the MUPA (the "Counterclaim").[4] Aluminum filed its answer to the Counterclaim on March 19, 2019.[5]

LLFlex moved for summary judgment on July 29, 2020.[6] On August 28, 2020, Aluminum submitted its opposition to the motion for summary judgment.[7] After a hearing,[8] the Court granted, in part, and denied, in part, LLFlex's motion for summary judgment on January 21, 2021.[9]

Aluminum then moved to amend the Amended Complaint.[10] Over LLFlex's opposition,[11] the Court granted, in part, leave to amend.[12] Aluminum filed the Second Amended

---

[2] The Court will use Oracle and LLFlex interchangeably.
[3] D.I. No. 29.
[4] *Id*.
[5] D.I. No. 35.
[6] D.I. No. 77.
[7] D.I. No. 82.
[8] D.I. No. 86.
[9] D.I. No. 92.
[10] D.I. No. 93.
[11] D.I. No. 94.
[12] D.I. No. 101.

Complaint on May 27, 2021.[13]   LLFlex filed it answer to the Second Amended Complaint on June 11, 2021.[14]  The Second Amended Complaint contains two claims: (i) Breach of Contract (Estimated Working Capital Dispute)("Count I"); and (ii) Breach of Contract (Jack White and Annealing Racks)("Count II").

## II.      THE TRIAL

### A. GENERAL

The Court conducted a bench trial on Count I, Count II and the Counterclaim from May 16, 2022 through May 20, 2022 (the "Trial").[15]  The Court then had both parties submit their closing arguments in written form, receiving the final post-trial paper on or about August 29, 2022.[16]  These are the facts as the Court finds them after assessing the witnesses' credibility and weighing the evidence.[17]

### B. WITNESSES

During the Trial, the Court heard from and considered testimony from the following witnesses:

Robert Gamba
Joshua Hoyt
Craig L. Green
James Squatrito
Kevin Hughes
Jack White
Jon Heard
Stephen J. Scherf

---

[13] D.I. No. 102.
[14] D.I. No. 109.
[15] D.I. No. 128.
[16] D.I. No. 141.
[17] The factual background in this post-trial decision cites C.A. No.:  N18C-07-231 EMD CCLD docket entries (by "D.I. No. __"); joint trial exhibits (by "JX __"); plaintiff's trial exhibits (by "PX__"); defendant's trial exhibits (by DX __"); the trial transcript (Trial Tr. __" by day "I-V"); Deposition transcripts lodged by the parties (by "witness last name"); and stipulated facts set forth in the parties' Joint Pre-Trial Order (by "PTO").

All the witnesses testified on direct and were available for cross-examination. The fact witnesses in this civil action were Mr. Gamba, Mr. Hoyt, Mr. Squatrito, Mr. Hughes, Mr. White, and Mr. Heard. The expert witnesses were Mr. Scherf and Mr. Green.

Normally, the Court would list the witnesses in the order they testified and which party called the witness; however, because the Trial was a bench trial, the Court took witnesses as presented and used Rule 611 of the Delaware Rules of Evidence to allow for examination of the witness for both parties cases-in-chief.

Here, the Court is the sole judge of each witnesses' credibility, including the parties.[18] The Court considers each witnesses' means of knowledge; strength of memory; opportunity to observe; how reasonable or unreasonable the testimony is; whether it is consistent or inconsistent; whether it has been contradicted; the witnesses' biases, prejudices, or interests; the witnesses' manner or demeanor on the witness stand; and all circumstances that, according to the evidence, could affect the credibility of the testimony.

The Court finds that—based on their testimony at the Trial, their manner or demeanor on the witness stand, and all circumstances that, according to the evidence, could affect the credibility of the testimony—all witnesses were straightforward and credible. Moreover, all witnesses provided testimony that was helpful to the Court on the issues to be decided in this civil action.

Both parties presented expert testimony during the Trial. In weighing expert testimony, the Court may consider the expert's qualifications, the reasons for the expert's opinions, and the reliability of the information supporting the expert's opinions, as well as the factors previously

---

[18] Taken from Superior Court Civil Pattern Jury Instruction 23.9.

4

mentioned for weighing the testimony of any other witness. Expert testimony should receive whatever weight and credit the Court thinks appropriate, given all the other evidence in the case.

## C. FINDINGS OF FACT

### 1. General Background

Aluminum is a Delaware Limited Liability Company.[19]

LLFlex is an Illinois Limited Liability Company with its principal place of business located in Louisville, Kentucky.[20]

Oracle and Aluminum entered into the MUPA on August 11, 2015.[21]

LLFlex is the successor in interest to Oracle Flexible Packaging, Inc., having merged into LLFlex on or before June 13, 2018.[22]

The MUPA contains a forum selection clause that designates that the Court has jurisdiction over disputes arising out of the MUPA.[23] The parties otherwise agree that the Court has valid jurisdiction over Count I and Count II, and the Counterclaim.[24] In addition, the Court is the proper venue for this dispute.[25] The parties agree that the MUPA is a valid and enforceable agreement between the parties.[26] The parties also agree that Delaware law applies to any dispute relating to the MUPA.[27]

On August 11, 2015, Aluminum's managing members were Mr. Gamba and Mr. Hoyt. Mr. Gamba has since resigned his role as managing member.[28] Mr. Gamba and Mr. Hoyt were

---

[19] PTO at 1.
[20] PTO at 2.
[21] JX 1.
[22] PTO at 3.
[23] JX 1, § 2.4.
[24] PTO at 4.
[25] PTO at 5; JX1, § 2.4.
[26] PTO at 21.
[27] PTO at 6.
[28] PTO at 8.

5

also the managing members of Alpha Aluminum, LLC ("Alpha").[29] Mr. Gamba acted as the President and CEO of Alpha, until his resignation on or about July 1, 2016.[30]

On August 11, 2015, Mr. Squatrito was LLFlex's president.[31] Mr. Squatrito left LLFlex in the summer of 2018.[32] Mr. Heard was LLFlex's chief financial officer when the MUPA was executed.[33] Mr. Heard left LLFlex in late spring or early summer of 2015.[34]

Prior to August 11, 2015, Oracle manufactured flexible packaging products, such as foil lining for cigarette packages, foil tops for yogurt or coffee pods, pharmaceutical products such as blister packs, and insulation for cable and wire.[35] Oracle manufactured these products at its Polo Road facility (the "Packaging Division") in Winston-Salem, North Carolina.[36] The Packaging Division products are generally referred to as "light gauge products."[37]

LLFlex was a sister company to Oracle. LLFlex manufactured flexible packaging products in a facility located in Louisville, Kentucky facility (the "LLFlex Facility").[38] On or about June 13, 2018, Oracle merged into LLFlex.[39] LLFlex was subsequently substituted as a party defendant for Oracle, the original named defendant.[40]

In addition to the Packaging Division, Oracle owned and operated an aluminum rolling mill (the "Mill") located on Cunningham Avenue in Winston-Salem, North Carolina. Oracle refers to the Mill as the "Metals Division." The Metals Division purchased aluminum ingots,

---

[29] PTO at 9.
[30] PTO at 10.
[31] PTO at 11.
[32] Id.
[33] PTO at 12.
[34] Id.
[35] Trial Tr. III at 78-9; Trial Tr. I at 90, 133; Trial Tr. IV at 69; PTO at 15.
[36] Id.
[37] Id.
[38] Trial Tr. I at 42; Trial Tr. III at 97; PTO at 15.
[39] PTO at 14.
[40] Id.

melted the ingots in furnaces, and then ran the melted ingots of aluminum through various rolling mills until it reached a desired thickness or "gauge," which were then sold in large aluminum rolls weighing thousands of pounds.

Oracle maintained separate accounting for the Packaging and Metals Divisions. Oracle maintained the separate accounting so it could track performance and generate financial statements for each division. The two divisions' financial statements were "rolled up" and consolidated for purpose of Oracle's annual audit.

The vast majority of the rolled aluminum made in the Mill was sold to Oracle's Packaging Division or LLFlex. On an annualized basis in 2013, 2014 and 2015, Oracle purchased 64%, and LLFlex purchased 15% of the Mill's total output, for a combined total of 79%.[41] Oracle sold the remainder of the Mill's output to external third-party purchasers.[42]

The evidence indicated that the Mill was losing money from its operations. The unaudited income statements of the Metals Division showed that the Metals Division had a negative EBIT of almost $2.7 million and a negative EBITDA of $1.4 million for the year ending December 31, 2014, and a negative EBIT and EBITDA of $2.2 million for the first four months of 2015.[43] Testimony at the Trial provided that the Mill's equipment was functional but also old and there were output quality issues.[44] Oracle was not prepared to invest the necessary capital expenditures to modernize the Mill to improve the quality and make it competitive.[45]

---

[41] JX 14 at Alum012662-64.
[42] Trial Tr. III at 82; Trial Tr. I at 51.
[43] JX 1 at MUPA000215-19; Trial Tr. II at 33-36; Trial Tr. IV at 220-22.
[44] Trial Tr. II at 41-61; Trial Tr. IV at 114.
[45] *Id*.

## 2. The Sale, the MUPA and Related Agreements

Oracle decided to sell the Mill.[46]  Oracle engaged a broker, Stout Risius Ross, to assist in the sale.[47]  Oracle then transferred a substantial portion of the Metal Division's assets and agreed liabilities to a limited liability company called Phoenix Aluminum, LLC, which later changed its name to Alpha.[48]

Mr. Gamba and Mr. Hoyt became interested in acquiring the Metals Division.[49]  Mr. Gamba and Mr. Hoyt formed Aluminum to be the buyer.[50]

Oracle and Oracle's then owner, Centre Lane Partners, agreed before the transaction that if the Mill was not sold to Aluminum, they would likely liquidate the Mill.[51]  Oracle understood that it would take six to nine months to find, and qualify, alternative suppliers for aluminum foil, the primary raw material used by Oracle in its other business divisions.[52]

On December 29, 2014, Oracle and Aluminum entered into a letter of intent for the purchase and sale of the membership units in Alpha.[53]  On June 9, 2015, Oracle and Aluminum entered into an amended letter of intent for the purchase and sale of the membership units in Alpha.[54]

Oracle and Aluminum executed the MUPA on August 11, 2015.  Through the MUPA, Oracle sold to Aluminum all the issued and outstanding membership units in Alpha.[55]

---

[46] PTO at 16.
[47] *Id.*
[48] PTO at 17.
[49] Trial Tr. I at 27-29.
[50] *Id.*
[51] PX 105; Trial Tr. IV at 49.
[52] *Id.*
[53] PTO at 18.
[54] PTO at 20.
[55] JX 1; PTO at 21.

8

In addition to the MUPA, the parties signed a series of agreements including: (i) a Secured Subordinated Promissory Note (the "Seller Note"); (ii) a Transition Services Agreement ("TSA"); (iii) a Product Supply Agreement ("PSA"); and (iv) a Sublease. The Seller Note, the TSA, the PSA and the Sublease are exhibits to the MUPA.[56]

The TSA provides that Oracle will provide services to Alpha during a transition period of up to nine months.[57] These services included financial, accounting, human resources, information technology and other services. The TSA obligated "[Oracle] to provide [Alpha] with the full-time services of Jack White, Director of Sales – Metals, in a manner consistent with the normal duties, responsibilities and authority implied by such position."[58] Aluminum and Oracle understood that if Mr. White was not reassigned to lead the Mill's sales for a transitional period after close, the transaction would not move forward.[59]

Under the PSA, Oracle was obligated to purchase, and Alpha was obligated to supply, a minimum of 12.2 million pounds of product, during the nine-month period covered by the PSA.[60]

The Sublease provides that Alpha was to pay rent to Oracle for the Cunningham Road property housing the Mill consistent with the terms of Master Lease under which Oracle was tenant.[61] In addition, Alpha was to post a letter of credit in favor of Oracle supporting its rent obligations, and otherwise comply with the terms of the Master Lease.[62]

After execution of the MUPA, Mr. Gamba became the president and CEO of Alpha.[63]

---

[56] JX 1 at MUPA00054, MUPA000063 and MUPA000086.
[57] JX 1 at MUPA00063-84.
[58] *Id*. at MUPA000084.
[59] Trial Tr. I at 56 and 104; Trial Tr. II at 89.
[60] JX 1 at MUPA000086-88.
[61] *Id*. at MUPA000110-205.
[62] *Id*.
[63] PTO at 14, Trial Tr. I at 28-29.

MUPA Article IV contains Oracle's representations to Aluminum.[64] Relevant to this case are Sections 4.10 (Real Property; Personal Property), 4.12 (Sufficiency of Assets) and 4.26 (Limitations on Warranties). The relevant portions of those sections are set out below.

Section 4.10(c) provides:

> 4.10 <u>Real Property; Personal Property.</u>
>
> . . .
>
>     (c) Except (i) as set forth on <u>Schedule 4.10(c)</u>, (ii) as set forth on the Latest Balance Sheet, (iii) for assets disposed of in the ordinary course of business since the date of the Latest Balance Sheet, or (iv) for Permitted Liens, the Company[65] owns, free and clear of all Liens, or has a Contract, license or lease to use, all of the personal property and assets shown on the Latest Balance Sheet, acquired thereafter or located at the Leased Real Property, in each case which is material to the Business or its operations (the "<u>Personal Property</u>"). The Personal Property includes all of the material tangible assets used in the conduct of the Business as currently conducted.[66]

Section 4.12 provides:

> 4.12 <u>Sufficiency of Assets</u>. Except as set forth in <u>Schedule 4.12</u>, the Company has good, valid and marketable title to, or a valid leasehold interest in or valid license to use, each of its assets, Personal Property and properties reflected in the Financial Reports or that are used or held for use in connection with and necessary for the conduct of the Business as heretofore conducted by the Company (the "<u>Assets</u>"), except for inventory sold following the date of the Latest Balance Sheet in the ordinary course of business consistent with past practice, in each case, free and clear of any Liens, except for Permitted Liens. The Assets, together with the services provided under the Transition Services Agreement, (a) constitute all of the properties and assets used or held for use in the conduct of the Business as heretofore conducted by the Company, and (b) are sufficient in all material respects for the conduct of the Business as currently conducted.[67]

Section 4.26 provides:

> 4.26 <u>LIMITATIONS ON WARRANTIES</u>. Except as expressly set forth in this Agreement (including, without limitation, this <u>Article IV</u>), Seller disclaims all liability and responsibility for any representation, warranty, or statement made or

---

[64] JX 1, Art. IV.
[65] Throughout the MUPA, "the Company" refers to the Mill.
[66] JX 1, § 4.10.
[67] JX 1, § 4.12.

information communicated (orally or in writing) to Buyer (including an opinion, information, projection or advice which may have been provided to Buyer or any of its Affiliates or any of its or their respective Representatives by the Company, Seller or any Representative of Seller or the Company). ALL IMPLIED WARRANTIES OF MERCHANTIBILITY AND FITNESS FOR A PARTICULAR PURPOSE ARE EXPRESSLY EXCLUDED. ANY AND ALL PRIOR REPRESENTATIONS AND WARRANTIES MADE BY SELLER OR ITS AFFILIATES OR ANY OF ITS OR THEIR RESPECTIVE REPRESENTATIVES, WHETHER VERBALLY OR IN WRITING, ARE DEEMED TO HAVE BEEN MERGED INTO THIS AGREEMENT, IT BEING INTENDED THAT NO SUCH PRIOR REPRESENTATIONS OR WARRANTIES SHALL SURVIVE THE EXECUTION AND DELIVERY OF THIS AGREEMENT.[68]

Article VII deals with indemnification between the parties.[69]

Section 7.10 provides that the indemnification terms under Article VII are "the sole and exclusive remedy of the Buyer Indemnified Parties for any and all Losses or other claims relating to or arising from this agreement or in connection with the transactions contemplated hereby."[70]

Section 7.1 creates a survival period of one year from closing for any claims.[71]

Section 7.6(a) sets out the procedure that must be followed for making a claim:

7.6 Procedures Relating to Indemnification

(a) . . . [T]he Indemnified Party shall deliver . . . to the party from which indemnification is sought (the "Indemnifying Party"), a certificate (a "Claim Certificate"), which shall

(i)    state that the Indemnified Party has incurred or anticipates it will incur Losses for which such Indemnified Party is entitled to indemnification pursuant to this Agreement; and

(ii)   specify in reasonable detail based upon the information then available . . . each individual item of Losses included in the amount so stated, the date such item was paid, the basis for any anticipated liability and the nature of the misrepresentation, breach of warranty, breach of covenant or claim to which each such item is related and the computation

---

[68] JX 1, § 4.26.
[69] JX 1, Art. VII.
[70] JX 1, § 7.10.
[71] JX 1, § 7.1.

11

of the amount to which such Indemnified Party claims to be entitled hereunder.[72]

The MUPA does not create any additional formalities as to the form of the Claim Certificate or its delivery.

Claims brought outside the Survival Period will not be limited if they fall under Section 7.4(i):

> (i)  notwithstanding anything to the contrary herein, none of the restrictions, limitations, caveats or qualifications in this Agreement shall limit any Person's rights, whether substantively or procedurally, with respect to recovery or other remedial relief in respect of intentional misrepresentation or fraud.[73]

Count II asserts claim under Article VII. In addition, the Counterclaim states claims under Article VII. As discussed below, Aluminum and LLFlex failed to comply with MUPA Section 7.6.

### 3. The Annealing Racks Dispute

Both parties agree that the Personal Property in MUPA Sections 4.10(c) and 4.12 include the Mill's annealing racks.

As set out during the Trial, annealing is a process where metal is heated and allowed to cool slowly, which removes internal stresses and makes it stronger. The Mill annealed aluminum on annealing racks and then delivered the aluminum on the racks to the Polo Road Facility where they remained in inventory until used by the Polo Road Facility, at which point they were returned.

Oracle represented in the MUPA that:

> [T]he Company owns, free and clear of all Liens . . . all of the personal property and assets shown on the Latest Balance Sheet, acquired thereafter or located at the [Mill], in each case which is material to the Business or its operations (the "Personal

---

[72] JX1, § 7.6(a).
[73] JX1, § 7.4(i).

12

Property"). The Personal Property includes all the material tangible assets used in the conduct of the Business as currently conducted.[74]

Oracle further represented that:

[T]he Company has good, valid and marketable title to . . . each of its assets, Personal Property and properties reflected in the Financial Reports or that are used or held for use in connection with and necessary for the conduct of the Business as heretofore conducted by the Company (the "Assets") . . . consistent with past practice. . . . The Assets, together with the services provided under the Transition Services Agreement, (a) constitute all of the properties and assets used or held for use in the conduct of the Business as heretofore conducted by the Company, and (b) are sufficient in all material respects for the conduct of the Business as currently conducted."[75]

The annealing racks were supposed to be a component part of the annealing furnaces at the Mill.[76] The annealing racks were necessary to conduct the Mill's business.[77] Aluminum anticipated, based on the representations in MUPA Sections 4.10 and 4.12, that the Mill would have more than 600 annealing racks to use at the Mill.[78]

Most of the racks, on the date of close, and thereafter, were located at Oracle's packaging facility across town from the Mill.[79] The evidence indicated that, after August 11, 2015, the Mill did not at any one time have access to the entirety of the annealing racks.[80]

Mr. Gamba testified that the lack of racks was one of the reasons that the Mill had to shut down frequently.[81]

LLFlex attempted to help the Mill find alternatives to the annealing racks.[82] Despite this, LLFlex never returned all the racks before the Mill ceased operations.[83]

---

[74] JX 1 § 4.10(c).
[75] JX 1 § 4.12.
[76] Trial Tr. I at 64.
[77] *Id*. at 71.
[78] *Id*. at 69; Trial Tr. II at 93-94.
[79] Trial Tr. I at 71-72.
[80] *Id*.; JX11.
[81] Trial Tr. I at 71.
[82] Trial Tr. IV at 100
[83] *Id*.

13

Mr. Gamba testified that an annealing rack has a replacement cost of $1,500.[84]

No evidence adduced at the Trial supports the contention that Oracle or any other party claimed ownership of the annealing racks. The actual dispute was over location of and/or access to the annealing racks at any one time

### 4. *The Jack White Services Dispute*

Oracle provided financial documentation to Aluminum prior to the execution of the MUPA that showed the Mill had lost external sales volume throughout 2014 and through May of 2015.[85] The Court heard testimony that external sales declined, in part, during this time because Mr. White, the primary salesperson for the Mill, had been reassigned to tasks that did not relate to the Mill in approximately the final quarter of 2014.[86]

Aluminum provided information to LLFlex's agent, Vince Pappalardodo, that sales could be affected if Mr. White's attention was not redirected to the Mill.[87] Aluminum sent this information to Mr. Pappalardo in a slide deck.[88] Mr. Pappalardo forwarded the slide deck to Mr. Heard, who received it.[89] Aluminum told Oracle that if Mr. White was not reassigned to lead the Mill's sales for a transitional period after close, the transaction would not move forward.[90]

Oracle agreed to provide certain services post-Closing to the Mill as part of a Transitions Services Agreement (TSA).[91] The parties to this agreement were Oracle and Alpha.[92] The TSA services were, however, part of the MUPA § 4.12 representations.[93]

---

[84] Trial Tr. I at 64-65.
[85] PTO at 19.
[86] Trial Tr. I at 39; Trial Tr. IV at 106-07.
[87] Trial Tr. IV at 103-04.
[88] PX 169A; Trial Tr. I at 103-04.
[89] PX 169B; Trial Tr. I. at 103-04.
[90] Trial Tr. I at 56-57; Trial Tr. II at 89.
[91] JX 1, TSA at MUPA000062.
[92] JX 1, TSA at MUPA000069-000070.
[93] JX 1, § 4.12.

Under Service Schedule VII, Oracle was to provide the Mill with Mr. White's services. The TSA provides that Oracle was to provide the Mill "with the full-time services of Jack White, Director of Sales – Metals, in a manner consistent with the normal duties, responsibilities and authority implied by such position" for "so long as Mr. White is employed by" Defendant or nine months after closing, whichever was shorter.[94]

Mr. White was the Director of Sales for Oracle's Metals Division.[95] Mr. White also performed some sales functions for LLFlex.[96] Mr. Gamba and Mr. Hoyt wanted Mr. White to become a full time employee of Alpha.[97] Although Mr. White seemed interested in joining Alpha, Mr. White decided to stay with Oracle.[98] As such, the parties agreed to include the services of Mr. White as part of the TSA.[99]

Mr. White had a limited sales function at the Mill for approximately eight weeks.[100] Mr. White testified that he spent this time attempting to reestablish relationships with customers that had lost faith in the Mill under Oracle's ownership due to quality and service issues.[101]

Mr. Payne did use Mr. White to perform sales functions that benefited LLFlex.[102] In addition, Mr. White carried out sales functions for LLFlex within the nine-month TSA period when Mr. White was supposed to be providing full-time sales duties to the Mill. During a period covered by the TSA, Mr. White headed the customer service department for LLFlex's Louisville operation, a role that did not relate to the Mill's sales.[103] Mr. Heard also asked Mr. White to

---

[94] JX 1, TSA Service Sch. VII.
[95] Trial Tr. IV at 123-24.
[96] Id.
[97] Trial Tr. III at 238-40.
[98] Trial Tr. IV at 126-27.
[99] JX 1, TSA.
[100] Trial Tr. I at 101, 109.
[101] Trial Tr. IV at 112-14.
[102] PX 177; PX 180; PX 181; PX 183; PX 185; PX 186; and PX 187.
[103] PX 187; Trial Tr. IV at 208-10.

provide information in support of LLFlex's response letter regarding the net working capital dispute between LLFlex and Aluminum during this same period.[104]

Mr. Gamba's complained that Mr. White was spending almost all his time working for Oracle or LLFlex, and not for Alpha. Mr. Gamba's first written complaint about Mr. White's alleged lack of services was on October 21, 2015.[105] Mr. Gamba notified LLFlex of the damages that Aluminum was sustaining as a result because of Mr. White's lack of sales support.[106] Mr. Gamba informed LLFlex of this verbally and in writing.[107] Aluminum contended that it was sustaining losses because of LLFlex's failure to provide Mr. White's services on a full-time basis on two occasions: December 14, 2015[108] and January 27, 2016.[109]

Mr. Squatrito testified at trial that he instructed Mr. Payne and Mr. White to continue to support the Mill with Mr. White's sales efforts, and that this instruction was being carried out.[110]

Mr. White conceded that he did not spend his full time working for Alpha because it was "not a full time job."[111] Mr. White did testify that he gave the job all of the time that it required, and he did not "deprioritize" Alpha.[112]

According to Mr. White, the plan was for Alpha to make the capital improvements necessary to modernize the equipment and to fix the quality issues that plagued the Mill.[113] Mr. White testified that the market for the Mill's product was small, and many customers already had bad experiences.[114] Mr. White said he could not successfully go to market without being able to

---

[104] PX 185.
[105] PX 178.
[106] Trial Tr. I at 85-86, 94-95, 97-100, 105, 127-30, 147-49; and Trial Tr. II at 6-7.
[107] PX 118; PX 125.
[108] PX 118
[109] PX 125.
[110] Trial Tr. III at 244-46.
[111] Trial Tr. IV at 165.
[112] *Id*.
[113] Trial Tr. IV at 165.
[114] Trial Tr. IV at 191-92.

demonstrate to the customers and the market that the quality issues had been addressed.[115]  Mr. White said he told this to Mr. Gamba.[116]

Mr. White provided that the Mill could not fill the orders it already had due to Alpha's cash flow issues and inability to purchase raw materials.[117]  Mr. White felt the Mill had production and service issues.[118]  Mr. White was therefore concerned about generating new orders.[119]  Mr. White testified that he did not want to sell to customers with the knowledge that Alpha could not timely fill the orders.[120]

Mr. White testified that no one at Oracle ever told him not to perform services for Alpha or to prioritize Oracle or LLFlex's work over his responsibilities with Alpha.[121]

The record demonstrates that Mr. White did not provide full-time services to Alpha.  The Court also finds that this seems to be more Mr. White's allocation of his resources than any action on the part of Oracle.

### 5. *The Estimated Working Capital Statement*

#### a. Preparation and Delivery of the Estimated Working Capital Statement

Article II of the MUPA provides for the calculation of the purchase price. The purchase price was:

(a) An amount paid at Closing (the "Closing Cash Payment["]) equal to:

    (i)    $4,500,000;

    (ii)    Plus the amount by which the Estimated Working Capital exceeds the Target Net Working Capital, if any; and

    (iii)    minus the amount by which the Target Net Working Capital exceeds the Estimated Working Capital, if any;

---

[115] *Id.*
[116] DX 520.
[117] Trial Tr. IV at 129, 203-04.
[118] *Id.*
[119] *Id.*
[120] Trial Tr. IV at 113-14.
[121] Trial Tr. IV at 214.

17

(iv)   minus the aggregate amount of Company Debt outstanding immediately prior to the Closing as set forth in the Pay-Off Statements (as defined below);

(v)   minus the unpaid portion of the Selling Expenses; and

(vi)   minus $1,250,000;

(b) plus the Promissory Note.[122]

The Estimated Working Capital was to be calculated according to the Section 2.4(a):

(a) Estimated Statement. At least three (3) days prior to the Closing Date, Seller shall prepare and deliver, or cause to be prepared and delivered, to Buyer a statement setting for the Company's good faith calculations of (i) the Net Working Capital as of the close of business on the day immediately preceding the Closing Date prepared in accordance with the principles set forth on Schedule 2.4(a) (such estimate, the "Estimated Working Capital"); and (ii) the Closing Cash Payment calculated in accordance with Section 2.2(a) and this Section 2.4(a) and based on the Estimated Working Capital.[123]

Schedule 2.4(a) defines, "under GAAP," the current assets as the Mill's cash in its bank account, its inventory, trade receivables and prepaid expenses while its liabilities are the Mill's net accounts payable and accrued liabilities.[124]  The MUPA defines GAAP as "United States generally accepted accounting principles, consistently applied."[125]

Under its Section 2.4(a) obligations, Oracle provided the Estimated Working Capital statement.[126]  The statement estimated the Mill's net working capital to be $5.25 million, or $1.25 million more than the Target Net Working Capital ($4 million).

The Estimated Working Capital statement was prepared by or under the control of its then CFO, Mr. Heard.[127]  Prior to the sale, there were no independently audited financial statements for the Mill alone.[128]  The only statements were for the "consolidated company," that

---

[122] JX 1, § 2.2.
[123] JX 1, § 2.4(a).
[124] JX 1 at MUPA 000204, Sch. 2.4(a).
[125] JX 1 at MUPA 00009 ("GAAP" definition).
[126] JX 2.
[127] Trial Tr. IV at 233-34..
[128] Trial Tr. IV at 222-24.

18

is the Polo Road facility and the Mill together and audited annually by RSM McGladrey.[129]  The

consolidated statements were, however, compliant with GAAP according to external auditors.[130]

### b. Aluminum disputes the Estimated Working Capital Statement

Aluminum had a contractual obligation to provide a "Closing Statement" within ninety

(90) days after closing.  Section 2.4(b) of the MUPA provides:

> (b) Closing Statement. Within ninety (90) days after the Closing Date, Buyer shall
> cause to be prepared and delivered to Seller a statement (the "Closing
> Statement") setting forth Buyer's good faith calculations of (i) the Net Working
> Capital as of the Closing, prepared in accordance with the principles set forth
> on Schedule 2.4(a), and (ii) the Closing Cash Payment calculated in accordance
> with Section 2.2 and based on the Final Net Working Capital.[131]

On November 8, 2015, Aluminum provided the Closing Statement.[132]  Aluminum noted

several factors relevant to this adjustment.  The "biggest single factor" was Oracle's valuation of

the aluminum at $1.00 per pound while Aluminum valued it "in accordance with GAAP" to the

PLATTS Metals Week Daily Midwest Transaction Price for the day of closing, around $.78 per

pound.[133]  The Purchase Price Adjustment also alleged overstated weights for various inventory,

obsolete inventory, outstanding product quality claims, overstated value for inventory

(particularly for finished goods that would have supplied the Polo Road facility), oil valuation,

other accruals and natural gas contracts in place.  Aluminum ultimately estimated that this added

up to an adjustment of $5,027,973.36 in its favor.[134]

---

[129] Trial Tr. IV at 242.
[130] Trial Tr. IV at 222-24.
[131] JX 1, § 2.4(b).
[132] JX 3.
[133] *Id*.
[134] *Id.*

19

Oracle responded on December 18, 2015 (the "Dispute Notice").[135] Oracle did not

dispute all of Aluminum's contentions but did dispute the valuation methodology.[136] Oracle

offered to adjust the purchase price by $362,912 to satisfy those concerns.[137]

### c. The Failed Arbitration

On January 27, 2016, Aluminum emailed Oracle outlining their issues with Oracle's

performance under the MUPA.[138] Aluminum alleged that the inventory valuation was not

GAAP-compliant.[139]

Section 2.4(c) contains an arbitration clause for closing statement disputes:

> d. <u>Purchase Price Adjustment</u>.
>
> <u>. . .</u>
>
> (c) <u>Closing Statement Dispute</u>. Within forty-five (45) days following receipt by Seller of the Closing Statement, Seller shall deliver written notice to Buyer of any dispute it has with respect to the preparation or content of the Closing Statement. If Seller does not notify Buyer of a dispute with respect to the Closing Statement within such forty-five (45)-day period, such Closing Statement will be final, conclusive and binding on the parties. In the event Seller disagrees with any items contained in the Closing Statement . . . Buyer and Seller shall negotiate in good faith to resolve the Disputed Amount. If Buyer and Seller, notwithstanding such good faith effort, fail to resolve the Disputed Amounts within thirty (30) days after Seller advises Buyer of its objections, then Buyer and Seller jointly shall engage Grant Thornton LLP (the "<u>Arbitration Firm</u>") for final determination of the Disputed Amounts.[140]

Under MUPA Section 2.4(c), the parties agreed to engage Grant Thornton as the

Arbitration Firm in February 2015.[141] Grant Thornton, however, declined to arbitrate the matter.

Grant Thornton contend that SEC independence rules precluded it from providing arbiter

---

[135] JX 14.
[136] *Id.*
[137] *Id.*
[138] PX 125.
[139] *Id.*
[140] JX 1, § 2.4(c).
[141] *Id.*

services while they had an audit relationship with Oracle's brother-sister company.[142]
Subsequent attempts to arbitrate failed with the parties disagreeing about who is the at-fault party.

### 6. Post-MUPA

Oracle continued to operate the Packaging Division and the Louisville, Kentucky facility.[143] On or about June 18, 2018, Oracle transferred substantially all its assets relating to the Packaging Division operations located at Polo Road, Winston-Salem, North Carolina business operation, to Tekni-Plex, Inc.[144]

Aluminum intended to make capital expenditures necessary to modernize the Mill. Mr. Gamba testified that modernization was necessary to improve the long-standing quality issues at the Mill and to move away from light gauge products.[145] Mr. Gamba testified that the plan was to expand the Mill's product miss to heavier gauge products and away from the light gauge products that were considered inefficient and unprofitable.[146]

At Trial, the Court was presented with a series of business plans prepared by Mr. Gamba and Mr. Hoyt. These plans are dated October 2014,[147] November 2014[148] and February 2015.[149] According to the evidence, these business plans identify a "Stage 1 CAPEX PLAN" in the first year of $8.6 million to buy new equipment and repair existing equipment.[150] Mr. Gamba testified that these plans were used to seek investors and lenders.[151]

---

[142] *Id.*
[143] PTO at 14.
[144] *Id*.
[145] Trial Tr. II at 37.
[146] DX 500 at Alum023761; Trial Tr. II at 37.
[147] DX 500.
[148] PX 101.
[149] PX 13.
[150] DX 500 at Alum 023766-67; PX 101 at Alum025150; and PX 103 at Alum025440.
[151] Trial Tr. II at 40-41.

The business plans sought to: (i) "to raise between US$3 to US$6 million in seed capital" and "an additional US$6+ million for CAPEX financing purposes;"[152] (ii) to raise $ 6 million to purchase the rolling mill assets and "finance, the first (of two) strategic capital improvements/investments[,] [t]he first is an $8+ million capital expenditure plan (CAPEX) which will 1) bring the plant up to current standards and 2) make the necessary equipment improvements and additions to achieve the mill's planned repurposing (PX 101 at Alum. 025152); and (iii) "to raise $ 6 million . . . or alternatively $15 million Mezzanine Unitraunch"[153]

Aluminum was unable to raise the funds called for in the business plans.[154] Aluminum had to capitalize the business with only (i) $900,000 in equity, (ii) a $1,500,000 equipment loan from Big Shoulders Capital at 18% interest,[155] (iii) an inventory and receivable line from BBT, which had availability at the time of closing of no more than $4,500,000,[156] and (iv) a $1,000,000 Seller Note.[157]

Alpha suffered cash flow issues. The Sublease required Alpha to post a letter of credit as security for its rent obligations in the amount of $196,000 within ninety (90) days of closing, which amount increased quarterly up to a maximum of $980,000.[158] Alpha failed to post any letter of credit.[159]

After acquiring the Mill, Alpha sought to transfer the electric utility into its name.[160] Because Alpha did not have credit, the utility required a $250,000 deposit. Alpha failed to post

---

[152] DX 500 at 023765.
[153] PX 103 at Alum025442.
[154] Trial Tr. II at 61-63, 67-68.
[155] DX 514.
[156] DX 512; DX 513.
[157] Trial Tr. II at 61-63, 67-68; JX 1 at MUPA000054.
[158] JX 1 at MUPA000119.
[159] Trial Tr. IV at 6.
[160] Trial Tr. IV at 7-8.

the deposit.[161]  Accordingly, the utility remained in Oracle's name, and Oracle had to pay the electric bill, and then seek reimbursement from Alpha.[162]

Alpha's primary lender was Branch Bank and Trust Company ("BBT").[163]  BBT loaned against eligible receivables and inventory pursuant to a formula detailed in the loan documents.[164]

Alpha was in covenant default of its BBT loan by October 4, 2015, less than two months after the August 11, 2015 closing.[165]  BBT contended that Alpha was over-advanced on its loan by $1,137,000 as of October 31, 2015.[166]

BBT transferred the loan to BBT's troubled loan/workout division by October or November 2015.[167]  BBT seems to have wanted to exit the facility soon thereafter.[168]

In late 2015, BBT reduced availability on the line of credit, by (i) changing the definition of Net Orderly Liquidation Value of Alpha's inventory against which it would loan from 72% to 53.3%,[169] and (ii) lowering the concentration limit from 75% to 50%, representing the percentage of receivables from one customer that BBT would loan against.[170]  At the time, the Mill sold as much as 79% of its product to Oracle and LLFlex.

Alpha was having trouble purchasing raw materials.  As of January 7, 2016, Alpha owed its primary metal supplier, Metallic Conversion (which was owned by Mr. Hoyt), approximately $3.3 million, and had not made a payment since November 12, 2015, almost 2 months earlier.[171]

---

[161] *Id.*
[162] *Id.*
[163] DX 512; DX 513.
[164] Id.; Trial Tr. II a96-97.
[165] DX 532; Trial Tr. II at 98.
[166] DX 540 at Alum001568; Trial Tr. II at 98.
[167] Trial Tr. II at 98-99.
[168] *Id.*
[169] DX  504; DX 554.
[170] Trial Tr. II at 113; DX 573; DX 504; and DX 554.
[171] DX 544 at Alum019005.

23

On January 6, 2016, Mr. Gamba wrote to BBT:

The problem right now . . . is that my shipping/order fulfillment is down 25% (500,000 Lbs. worth approximately $760,000) in December because of restricted access to raw materials due to vendor non-payment [referring to Alpha's failure to pay Metallic Conversion]. I have another 2.2 million lbs. of orders to ship in January. Right now based on a continuation of the above mentioned vendor non-payment, our access to raw materials continues to be restricted and these numbers are in jeopardy.[172]

On January 7, 2016, Mr. Gamba advised BBT that "I am now having to turn off one of my [two] furnaces and we have only been on one caster for over about a month now due to the supply situation."[173] On January 26, 2016, Mr. Gamba wrote to BBT:

Of the order commitments we had in January to ship of ~ 2.3 million lbs., we received ~ 800K lbs., leaving a hole of ~ 1.5 million lbs. . . . In January, we had sales commitments to manufacture for February delivery again of ~ 2.3 million lbs. and by the close of the month it looks like we will have had delivered against that just ~ 1.1 million lbs. This means a shortfall of metal units coming in around 1.2 million lbs. Given a sales book of 4.6 million lbs. for January and February, and receipts of metal for 1.9 million lbs. [i]t's not hard to guess how that ends when we are in effects short by 2.7 million lbs. of material.[174]

The Mill's lack of raw material led to numerous customer order delays.[175] Alpha's inability to improve and modernize the equipment led to continuing and additional quality issues. All of this diminished the Mill's ability to sell product and to bring in revenue to support the business.[176]

Alpha eventually factored or borrowed against its receivables from Accord Financial Inc.[177] The maximum amount that could be sold or borrowed was $1.25 million, and the balance owed bore interest at prime plus 10%.[178]

---

[172] DX 542 at Alum002096.
[173] DX 544 at Alum019004.
[174] DX 550.
[175] Trial Tr. IV at 118-19, 193-94 and 1026-1027.
[176] Id.; see, e.g., DX 529; DX 535; DX 538; DX 549; DX 551; DX 553; DX 555; and DX 585.
[177] DX 578-82.
[178] Id.

On July 1, 2016, Mr. Gamba resigned his position.[179]  Soon thereafter, Alpha abandoned the Mill shortly thereafter.[180]

### 7.  *Lack of Bad Faith, Intentional Misrepresentations and/or Fraud*

The Court finds no evidence that Aluminum or LLFlex acted in bad faith, made intentional misrepresentations or committed fraud.  The Court understands that is a broad finding; however, the Court heard the witnesses testify and reviewed the exhibits.  As presented during the Trial, the parties acted, at time, cooperative but also in their respective business interests.

While the parties may have not met obligations perfectly or engaged in disputes, the record does not support a finding that either party acted in bad faith, purposely misrepresented material facts or engaged in "sham" transactions.  The margin of error on this transaction was narrow.  Events did not transpire in a way that the Mill could succeed.  The Court finds no evidence that LLFlex purposely blocked or prevented the Mill from succeeding, or otherwise acted in bad faith with respect to the obligations of Oracle (or LLFlex) under the MUPA.

### III.  THE HOLDING ON COUNT I, COUNT II AND THE COUNTERCLAIM

In Delaware, a party must allege and prove three things to prevail on a breach of contract claim: (i) a contract exists, (ii) a breach of the terms of that contract and (iii) resultant damages.[181]  The breach of contract claim must be proved by a preponderance of the evidence.[182] The claims of Aluminum and LLFlex are all breach of contract claims—i.e., Count I, Count II and the Counterclaim.

---

[179] PTO at 10; Trial Tr. II at 7.
[180] *Id.*; Trial Tr. III at 68.
[181] *Braga Inv. & Advisory, LLC v. Yenni Income Opportunities Fund I, L.P.*, 2020 WL 3042236, at *8 (Del. Ch. June 8, 2020) (breach of contract claim under Delaware law requires a contract, breach, and damages because of the breach).
[182] *Id.*

After considering the evidence, the Court is entering judgment in favor of LLFlex on Count I and Count II. Except, that as to Count I, the Court holds that LLFlex needs to compensate Aluminum for a purchase price adjustment of $362,912—an amount previously agreed to by Oracle. The Court is entering judgment in favor of Aluminum on Counterclaim I. The Court finds that the parties have failed to adequately prove their claims by a preponderance of the evidence. In addition, the Court finds that Aluminum and LLFlex failed to satisfy the contractual requirements under the MUPA to proceed on contract claims. The evidence and testimony at trial demonstrate that Aluminum failed to establish the elements of its claims.

The problem lies with causation. The Court agrees that there are problems related to the availability of the annealing racks and the focus of Mr. White's services; however, the evidence also supports the conclusion that Aluminum's inability to sufficiently capitalize the Mill is a significant cause for the Mill's failure. Despite not paying rent or utility bills (significant numbers), Aluminum needed to shutter the Mill within a year of execution of the MUPA. The evidence adduced during the Trial showed that the Mill was a business losing more than two million dollars annually. Financial statements attached to the MUPA show that the Metals Division had a negative EBIT in excess of $2.5 million and a negative EBITDA of almost $1.5 million for the year ending December 31, 2014. The number for the first four months of 2015 were a negative EBIT and EBITDA of $2,172,931.[183]

Oracle decided to sell the Mill because it was losing money. Aluminum knew this but planned to change the focus of the Mill from manufacturing light-gauge aluminum to primarily heavy-gauge aluminum.[184] Aluminum intended to increase sales activities and expend new capital. Aluminum's business plans estimated that the capital expenditure necessary to convert

---

[183]*See* JX 1 at MUPA000215, 000219, Trial Tr. II at 33-36; Trial Tr. IV at 220-22.
[184]DX 500 at Alum023761, 023778; Trial Tr. II at 37.

the Mill and address existing quality issues was $8.6 million.[185] The additional capital expenditures were in addition to the cash needed to close the MUPA, the funds to cover anticipated operating losses and to acquire raw materials to fulfill customer orders.

The business plans anticipated an equity raise of between $3 million and $6 million, and debt financing to fund $8.6 million in capital expenditures.[186] The evidence at the Trial showed that Aluminum was unable to raise these funds. Aluminum executed the MUPA with a budget of only (i) $900,000 in equity, (ii) a $1.5 million equipment loan from Big Shoulders Capital at 18% interest, (iii) an inventory and receivable line from BBT, which had availability at the time of closing of no more than $4.5 million and (iv) a $1 million Seller Note.[187] In the end, these amounts were inadequate to bear the financial obligations and sustain the Mill. This was true even though the Mill did not pay rent or utilities.

Aluminum argues that LLFlex wanted the Mill to fail and/or did not care if the Mill closed. The Court finds that the evidence does not support that conclusion. LLFlex seemingly wanted the Mill to succeed at least for a time post-closing. LLFlex used the Mill as Oracle's domestic supplier, a "qualified supplier" for Oracle's pharmaceutical customers, and Oracle's largest supplier, supplying Oracle with two-thirds of its volume.[188]

The Trial demonstrated a situation where Aluminum (as Alpha) tried its best with the Mill but under difficult financial and operational conditions. In addition, the evidenced showed that Oracle worked with Aluminum to try and address issues as the issues arose. The Court finds no evidence that Oracle (or LLFlex) intentionally or recklessly misrepresented facts to Aluminum or otherwise acted fraudulently as to Aluminum or the Mill's operations. The

---

[185]DX 500 at Alum023766-67; PX 101 at Alum025150; and PX 103 at Alum025440.
[186]*Id.*
[187]JX 1 at MUPA000054; Trial Tr. II at 61-63, 67-68.
[188]Trial Tr. III at 87-92; Trial Tr. IV at 69.

business situation—antiquated equipment, thin capitalization and deteriorating sales—was not ideal. The Mill and its operations would not have been saved by more accessible annealing racks or the increase services of Mr. White. In Count I, Aluminum claims that LLFlex breached MUPA Section 2.4, the purchase price adjustment procedures, by allegedly overstating its net working capital, and seeks damages of "at least $1,761,137."[189] In Count II, Aluminum contends that LLFlex breached MUPA Sections 4.10(c) and 4.12 by purportedly "withholding annealing racks" needed to operate the Mill, and by allegedly preventing Mr. White from providing his full-time services to Alpha in violation of the TSA.

As detailed below, in each case, Aluminum failed to meet its evidentiary burden. Accordingly, the evidence and testimony adduced at trial, together with applicable law, require judgment in favor of LLFlex, and against Aluminum.

### A. COUNT I—BREACH OF CONTRACT

The MUPA contains a standard purchase price adjustment procedure tied to Net Working Capital. The MUPA set target Net Working Capital at $4 million.[190] According to MUPA Section 2.4 and Schedule 2.4, Oracle must deliver to Alpha its "good faith calculations" of the anticipated Net Working Capital on the day of closing, referred to in the MUPA as the Estimated Working Capital.[191] Alpha then had ninety days to deliver its Closing Statement to Oracle, setting forth Alpha's good faith calculations of Net Working Capital on the day of closing.[192] Oracle then had forty-five (45) days to notify Alpha if Oracle disputed Alpha's proposed Closing Statement.[193] If there were a dispute, Oracle and Alpha were to engage in good faith

---

[189]Second Amended Compl. ¶¶ 78, 88.
[190]JX 1 at MUPA 000208.
[191]*Id.*
[192]*Id.*
[193]*Id.*

28

negotiations, after which, the dispute is to be submitted to Grant Thornton for arbitration of the Disputed Amounts.[194]

The evidence demonstrated Oracle delivered it's Estimated Working Capital statement on the day of closing. Oracle's Estimated Working Capital statement estimated that Net Working Capital on the day of closing would be $5.25 million.[195] Approximately ninety days later, Alpha provided its Closing Statement.[196] Alpha's Closing Statement estimated Net Working Capital at $3.3 million.[197] Alpha then demanded a purchase price adjustment in its favor of $5 million.[198] Oracle responded with its Dispute Notice, agreeing to $362,912 in adjustments, but rejecting the remaining requested adjustments.[199]

Aluminum contends that the Estimated Working Capital delivered by Oracle was in bad faith, intentionally overstated the value of inventory and other assets, was not GAAP-compliant, and therefore breached Section 2.4 of the MUPA. Aluminum claims it "was deprived of its contractually agreed-to opportunity to recoup the sum of money from Defendant which Plaintiff overpaid for the Company, which is at least $1,761,137."[200] To prevail, Aluminum must prove that (i) that the Estimated Working Capital was not prepared in accordance with the MUPA and GAAP, and (ii) Oracle's calculations of the Estimated Working Capital were not "good faith calculations."[201]

The Court finds that Aluminum failed to prove, by a preponderance of the evidence, that Oracle breached Section 2.4.

---

[194]Id.
[195]JX 2.
[196] JX 3.
[197] Id.
[198]Id.
[199]JX 14.
[200]SAC at ¶ 64, 88.
[201]JX 1 at MUPA0014, 0208.

The Court finds that Aluminum failed to demonstrate at Trial that Oracle's Estimated Net Working Capital statement was inconsistent with the MUPA and GAAP. Schedule 2.4 governs the determination of Net Working Capital.[202] Schedule 2.4 requires that Net Working Capital be prepared in accordance with GAAP.[203] The MUPA defines "GAAP" as "United States generally accepted accounting principles, consistently applied."[204] Schedule 2.4 additionally provides:

> Inventory — Manufacturing inventories of the Company (materials, labor, direct manufacturing costs and overhead used in the manufacture of products produced by the rolling mill which become a constituent part of the finished product, calculated in a manner consistent with past practice, including, metals, alloys, metal scrap, work-in process and finished goods inventories.[205]

"GAAP is not a set of prescriptive rules."[206] "Instead, GAAP 'tolerate[s] a range of "reasonable" treatments, leaving the choice among alternatives to management.'"[207]

The Court reads the MUPA to require inventory be valued using the same methodology employed by Oracle pre-sale if that method is GAAP compliant. Indeed, the experts, Mr. Greene and Mr. Scherf, agree on this point.[208]

Mr. Heard testified that Oracle valued its inventory in its books using a standard cost methodology, which is common in the manufacturing industry.[209] Mr. Scherf testified that standard cost methodology is GAAP compliant if periodic adjustments are made to reflect

---

[202]*Id.* at MUPA0020.

[203]*Id.*

[204]*Id.* at MUPA0009. "GAAP is not a set of prescriptive rules." *Alliant Techsystems, Inc. v. MidOcean Bushnell Holdings, L.P.*, 2015 WL 1897659, at *8 (Del. Ch. Apr. 24, 2015). "Instead, GAAP 'tolerate[s] a range of "reasonable" treatments, leaving the choice among alternatives to management.'" *Id.* (quoting *Thor Power Tool Co. v. C. I. R.*, 439 U.S. 522, 544 (1979)).

[205] JX 1 at MUPA0208.

[206] *Alliant Techsystems, Inc. v. MidOcean Bushnell Holdings, L.P.*, 2015 WL 1897659, at *8 (Del. Ch. Apr. 24, 2015).

[207] *Id.* (quoting *Thor Power Tool Co. v. C. I. R.*, 439 U.S. 522, 544 (1979)).

[208] Trial Tr. III at 176; Trial Tr. V at 38.

[209] Trial Tr. IV at 233.

variances in material pricing and costs of manufacture as compared to the standard cost.[210] Mr. Scherf explained that Oracle maintained its books on a standard cost system and that when there is a difference between the standard cost and the actual cost there is a variance that is maintained and gets recorded on the profit and loss statement.[211] In that situation, GAAP requires periodic recording of the variances to adjust the standard costs to actual costs.[212] Mr. Greene testified on the same point. Mr. Greene noted that standard costs are acceptable if adjusted at reasonable intervals to reflect current conditions so the balance sheet date standard costs reasonably approximate costs[213]

Oracle made the necessary purchase price and manufacturing variance adjustments to its standard cost of $1.00 so that its books and records, and the amount contained on the Estimated Working Capital statement, represented Oracle's actual cost of inventory.[214] Mr. Heard testified that, if the actual purchase price of a material differed from the standard cost, Oracle would adjust the inventory when it closed its books on a monthly basis.[215]

The evidence showed that Oracle made the necessary adjustments to its standard costs.[216] The Dispute Letter contained a month-by-month detail of the adjustments and explained that

> [t]he above numbers represent both purchase price variances (the actual amount paid for raw materials vs the standard cost of the inventory in the ERP system) and manufacturing variances (the actual cost to produce inventory products vs the standard cost of the inventory products in the ERP system).[217]

---

[210] Trial Tr. V at 35.
[211] *Id.*
[212] *Id.*
[213] Trial Tr. III at 179.
[214] Trial Tr. IV at 235.
[215] *Id.*
[216] JX 4 at LLFlex3954 (emphasis in original).
[217] *Id.*

Mr. Scherf testified that he reviewed Oracle's books and other financial records and was able to test and confirm the variances.[218]  Moreover, Mr. Greene acknowledged that "Oracle Flexible Packaging did, in fact, periodically adjust its books and records to reflect a purchase price variance and manufacturing variances."[219]

RSM McGladrey audited Oracle's consolidated financial statements.[220]  The evidence shows that Oracle's consolidated financial statements specifically included the financial statements of the Metals Division, which were rolled up into the consolidated financial statements and were audited annually by RSM McGladrey.[221]  RSM McGladrey issued unqualified audit opinions which means that RSM McGladrey accepted Oracle's valuation methodology and conclusion.[222] These facts further support the conclusion that Oracle's inventory valuation methodology was accurate and GAAP compliant.

GAAP requires an additional test to ensure that market forces have not driven the value of the inventory below its historical cost.[223]  Mr. Scherf conducted a detailed analysis to determine the relevant market price of the inventory and determined that the market price was in excess of the historical cost.[224]  Based upon his analysis, Mr. Scherf concluded that Oracle's calculation of the Net Working Capital set forth in Oracle's Estimated Working Capital statement and Dispute Notice was correct and accurately represented the Net Working Capital on the day of closing, August 11, 2015.[225]

---

[218]Trial Tr. V at 37.
[219] Trial Tr. III at 180.
[220] Trial Tr. IV at 222-24, 242.
[221] *Id.*
[222] *Id*. at 222-24.
[223] Trial Tr. V at 36-38.
[224] *Id*.
[225] *Id.* at 52.

32

The focus on Mr. Scherf and not Mr. Greene is not to imply that Mr. Greene's testimony was unreliable or inconsistent. Aluminum bears the initial burden of proof in showing a breach. Mr. Scherf is a credible witness. Mr. Scherf's opinions are supported by the evidence and his methodologies are sound.

MUPA Section 2.4(a) required Oracle to prepare the Estimated Working Capital Statement in "good faith." The Court cannot find, on this record, that Oracle did not prepare the Estimated Working Capital Statement in good faith. The evidence shows that Oracle calculated the Estimated Working Capital in accordance with the MUPA and GAAP as consistently applied, and in the manner repeatedly accepted by its third-party auditor.

Mr. Heard testified about how Oracle prepared the Estimated Working Capital statement and the Dispute Notice.[226] Specifically, Mr. Heard testified that, in calculating the Estimated Working Capital, Oracle "would have been trying to look into the future on – to the closing date and estimate as best we could, [ ] what the net working capital would be on the closing date."[227] Mr. Heard also testified that the Estimated Net Working Capital was prepared "consistent with how [Oracle] kept the books and records of the company for each one of those line items [on the Estimated Net Working Capital]."[228]

The Court finds that the evidence at Trial does not support a finding that Oracle acted in bad faith when preparing the Estimated Net Working Capital. For this additional reason, Aluminum has failed to meet the evidentiary burden to demonstrate a breach of MUPA Section 2.4.

---

[226] Trial Tr. IV at 224-42.
[227] Trial Tr. IV at 225-26.
[228] *Id.* at 227.

33

"Under Delaware law, a breach of contract claim ... requires a showing of compensable injury."[229]  To be compensable, the plaintiff must prove "damages that the plaintiff suffered as a result of the breach."[230]  "To satisfy this element, a plaintiff must show both the existence of damages provable to a reasonable certainty, and that the damages flowed from the defendant's violation of the contract."[231]

Causation is a problem.  The Court finds that Aluminum cannot prove causation.  The evidence demonstrates that Aluminum was aware, prior to closing, that: (i) a purchase price adjustment would need to occur; and (ii) the adjustment procedure, under the MUPA, would not be complete prior to April 7, 2016.[232]  The evidence also demonstrates that Aluminum suffered financially months (no later than December 2015) before the purchase price adjustment procedures in MUPA Section 2.4 could have been completed.  As mentioned above, the evidence shows:

- Alpha could not post a $196,000 letter of credit to secure the rent obligations under the Lease;[233]

- Alpha could not post a $250,000 security deposit with the electric company to transfer the account into Alpha's name;[234]

- Alpha was in covenant default with BBT, its senior lender, by October 4, 2015;[235]

- Alpha was over-advanced on the loan with BBT by $1,137,000 less than three months after closing;[236]

- By November 2015, BBT transferred the loan to the troubled loan – workout division;[237]

---

[229] *Braga Inv. & Advisory, LLC,* 2020 WL 3042236, at *12.
[230] *Id*.
[231] *Id.*
[232] Trial Tr. I at 88-92.
[233] JX 1 at MUPA000119; Trial Tr. IV at 6.
[234] Trial Tr. IV at 7-8.
[235] DX 532; DX 512, 513; Trial Tr. II at 96.
[236] DX 540 at Alum001568; Trial Tr. II at 98.
[237] Trial Tr. II at 98-99.

- In November and December 2015, BBT reduced availability on the line of credit, by (i) changing the definition of Net Orderly Liquidation Value of Alpha's inventory against which it would loan from 72% to 53.3%[238] and (ii) lowering the concentration limit (the percentage of receivables from one customer that BBT would loan against) from 75% to 50%;[239] and

- Alpha fell behind in payments to Metallic Conversion, the primary material supplier, and by January 2016 owed Metallic Conversion approximately $3.3 million with no payments made since November 2015.[240]

The record demonstrates that Aluminum's lack of funds caused supply and raw material constraints that resulted in the inability to fulfill orders. These facts demonstrate that thin capitalization was the more likely cause of the Mill's failure. The record does not demonstrate, by a preponderance of the evidence, that cash from a purchase price adjustment in April 2016 would have caused the Mill to be viable.

One point, Oracle did make an admission against interest on the purchase price adjustment. Oracle agreed to $362,912 in adjustments in Aluminum's favor while rejecting other requested adjustments.[241] While there was no arbitration under MUPA Section 2.4(c), Oracle, here LLFlex, needs to compensate Aluminum for that amount. Therefore, the Court will award Aluminum a purchase price adjustment of $362,912.

### B. COUNT II—BREACH OF CONTRACT

Count II is a two-part breach of contract claim entitled "Jack White and Annealing Racks."[242] Aluminum asserts two separate breaches of representations and warranties contained

---

[238] DX 504; DX554.
[239] DX 573; DX 504; DX554; Trial Tr. II at 113.
[240] DX 544 at Alum019005.
[241] JX 14.
[242] SAC at pp. 25.

35

in MUPA Sections 4.10(c) and 4.12. Aluminum then seeks indemnification for these breaches.[243]

Aluminum contends that Oracle "withheld approximately $900,000 worth of annealing racks necessary for the Company's operation."[244] Next, Aluminum claims that LLFlex prevented Mr. White from providing his sales expertise to Alpha and that this was contrary to the terms of the TSA (under which Mr. White was to provide full-time services to Alpha). Aluminum contends this situation "led to a loss of external sales that had a profit/loss impact of $3.2 million in the first year and continued thereafter."[245] During the Trial, Aluminum increased the purported impact to approximately $4.3 million.[246]

The Court finds that Aluminum has failed to prove breach of the MUPA as to the annealing racks and Mr. White. First, the evidence demonstrates that Aluminum failed to comply with MUPA Article VII. MUPA Article VII provides how and when indemnification claims need to be made.[247] To recover for "Losses or other claims relating to or arising from [the MUPA] in connection with the transactions contemplated [t]hereby[,]" Aluminum was required – but failed – to deliver a claim certificate that comported with the MUPA's notice provisions.[248] Second, even if Aluminum could be found to have complied with MUPA Article VII, Aluminum failed to prove the elements of a breach of contract claim: (i) a breach, (ii) that the alleged breach was the cause of the damages sought, and (iii) damages that are not speculative.

---

[243] In its Trial Brief, Aluminum references a claimed breach of MUPA Sections 4.11 and 9.4. Aluminum did not assert these breaches in the Second Amended Complaint.
[244] SAC ¶ 100.
[245] *Id.* ¶¶ 94-95.
[246] Trial Tr. I at 104.
[247] JX 1 Article VII.
[248] JX 1 §7.10.

### 1. *Count II is Barred Because Aluminum Failed to Comply with MUPA Section 7.*

The MUPA provides that the indemnification procedures contained in MUPA Section 7.10 "constitute the sole and exclusive remedy . . . for any and all Losses or other claims relating to or arising from [the MUPA] or in connection with the transactions contemplated [t]hereby." Pursuant to the MUPA, a party was obligated to deliver a "Claim Certificate" to the party from which it seeks indemnification within the "Survival Period" of twelve months from August 11, 2015 in order to invoke any possible indemnification rights or claims.[249]

The Claim Certificate, which must be brought within the "Survival Period," must:

(i)        state that the Indemnified Party . . . is entitled to indemnification pursuant to this Agreement; and

(ii)       specify in reasonable detail . . . Losses . . ., the basis for any anticipated liability and the nature of the misrepresentation, breach of warranty, breach of covenant or claim to which each item is related and the computation of the amount to which such Indemnified Party claims to be entitled hereunder.[250]

Only after a Claim Certificate is timely delivered within the Survival Period may the party seeking indemnification file a claim for damages for breach of a representation and warranty.[251] The MUPA requires any notice provided thereunder, which includes a Claim Certificate, comply with MUPA Section 9.5. MUPA Section 9.5 requires any notice be sent to Oracle, with a copy delivered to its private equity sponsor, Centre Lane Partners, LLC, attention Nathan Richey, and to its counsel, Katten Muchin, Rosenman LLP, attention Stephen Antion.[252]

In denying in part LLFlex's Motion for Summary Judgment, the Court found that PX 125 put LLFlex on notice as to the estimated working capital misrepresentations, racks, and Mr.

---

[249] JX 1 § 7.1.
[250] JX 1 §7.6(a).
[251] *See* JX 1 at MUPA0042-43, §7.6.
[252] JX 1 at MUPA0048-49.

White's employment. PX 125 however, was only sent to Mr. Heard and Mr. Squatrito, and was not copied to Centre Lane Partners, or Katten Muchin. Aluminum did not satisfy the requirements for formal notice of a Claim Certificate. The Court finds that, after completion of the factual record at Trial, Aluminum failed to comply with the MUPA's notice requirements, a condition precedent to its Count II for indemnification.

Aluminum relies on a series of e-mails, claiming that these comply with the Claim Certificate requirements.[253] Of these e-mails, one dated November 8, 2015, one does copy Oracle's private equity sponsor and counsel; however, this e-mail does not otherwise comply with MUPA Section 7.6(a).[254]

The e-mail does not reference indemnification or Article VII. Moreover, the e-mail does not mention Jack White or his services. The e-mail does mention a "possible" purchase price adjustment as to the annealing racks. However, the e-mail does not put Oracle (or others) on notice of a claimed breach of a representation or warranty, the representation or warranty allegedly breached, or that Aluminum was making a claim for indemnification. The subject line of the e-mail reads: "Purchase Price Adjustment request pursuant to our 8-11-2015 Membership Unit Purchase Agreement," and requests that Oracle "kindly add this $900,000.00 to our attached purchase price adjustment request as an additional accrual to cover potential non return of the racks."

The Court finds that requesting an additional line-item in the calculation of Net Working Capital does not comply with making a claim under Article VII for an alleged breach of a representation and warranty. The MUPA requires a more formal notice. Otherwise, each e-mail would constitute a Claim Certificate, and that would give rise to a very haphazard and confusing

---

[253] JX 11; JX 12; JX 13; PX 143; JX 3; PX 118; PX 125.
[254] JX 3.

process. Indeed, Mr. Squatrito testified that neither Mr. Gamba, Mr. Hoyt, nor their counsel, Nixon Peabody, ever suggested that Buyer had made a demand for indemnification pursuant to the terms of the MUPA.[255]

Such exclusive remedy provisions are fully enforceable in Delaware.[256] Refusing to enforce an exclusive remedy provision would "defeat the reasonable commercial expectations of the [ ]parties."[257] As a matter of law, where the contract specifies what constitutes notice thereunder and dictates how to communicate that notice, strict compliance with the notice provision is necessary.[258] Accordingly, Aluminum's indemnification claim is contractually barred, and LLFlex is entitled to judgment on Count II.

### 2. Aluminum Failed to Prove by a Preponderance of the Evidence the Elements Necessary for a Breach of Contract Claim.

Alternatively, the Court finds that, even if Aluminum had delivered a timely a Claim Certificate, Aluminum failed to prove the elements of its Count II Breach of Contract Claim— *i.e.*, a breach, causation and damages.

#### a. The Annealing Racks.

Aluminum failed to establish that Oracle breached MUPA Sections 4.10 or 4.12 with respect to the annealing rack claim. The Court does not find that the record supports the conclusion that Oracle withheld annealing racks in a manner that constituted a breach of

---

[255]Trial Tr. IV at 16.

[256] *JCM Innovation Corp. v. FL Acquisition Holdings, Inc.*, 2016 WL 5793192, *7 (Del. Super. Sept. 30, 2016); *see also Eni Holdings, LLC v. KBR Group Holdings, LLC*, 2013 WL 6186326, *7 (Del. Ch. Nov. 27, 2013).

[257] *Transched Sys. Ltd. v. Versyss Transit Sols., LLC*, 2008 WL 948307, *2 (Del. Super. Apr. 2, 2008).

[258]*See PR Acquisitions, LLC v. Midland Funding LLC*, 2018 WL 2041521, at *8 (Del. Ch. 2018) (seller was entitled to release of escrow funds and buyer was not entitled to escrow funds because buyer's claim under escrow agreement was barred as untimely and failed to comply with notice provisions); *HBMA Holdings, LLC v. LSF9 Stardust Holdings LLC*, 2017 WL 6209594, at *7 (Del. Ch. Dec. 8, 2017), *order clarified*, (Del. Ch. 2018) (dismissing complaint as time barred where the notice did not comport with contract's requirements for proper notice of indemnification); *i/mx Info. Mgmt. Sols., Inc. v. Multiplan, Inc*, 2014 WL 1255944, at *13 (Del. Ch. 27, 2014) (claimed notice did not constitute sufficient notice within the survival period under the parties' agreement).

contract. The evidence at Trial showed that the Mill's production shutdowns were not due to running out of racks. Alpha was delivering approximately 1.2 million pounds of product each month to Oracle.[259] Alpha needed enough annealing racks to run the business. Testimony showed that the Mill delivered product to Oracle on between 200 and 300 annealing racks each month.[260] This means that racks were being used and returned in a type of circulation between Alpha and Oracle and not that Oracle somehow converted property of Alpha into property of Oracle. If that were true, then Alpha would not have been able to deliver this product to Oracle month after month. Could Alpha and Oracle have been more efficient with the annealing racks or substitutes. Probably. The representation relates to ownership of personal property (here, the annealing racks) and not to misuse.

Aluminum's type of conversion claim is belied by the evidence adduced at the Trial. While Alpha complained about running low on racks or potentially running out of racks, there appears to be only one instance where Alpha contended that the Mill had to stop production due to lack of racks.[261] Moreover, Alpha told BBT that funding restrictions – not an annealing rack shortage – caused the Mill to shut down production.[262]

Even if Alpha was low on racks at certain times, the Court does not find that is constitutes a breach of the MUPA. The MUPA controls. Oracle represents in MUPA Section 4.10(c) that Oracle owned

> all of the personal property and assets shown on the Latest Balance Sheet . . . in each case which is material to the Business or its operations (the 'Personal Property') [and that] the Personal Property includes all of the material tangible assets used in the conduct of the Business as currently conducted.[263]

---

[259] Trial Tr. II at 134; DX 564; Trial Tr. III at 219.
[260] Trial Tr. at 219.
[261] PX 148.
[262] DX 544 ("[We are] now having to turn off one of my furnaces and we have only been on one caster for over about a month now due to the supply situation.").
[263] JX 1, § 4.10.

40

Oracle also represents in MUPA Section 4.12 that Oracle has title to the assets "that are used or held for use in connection with and necessary for the conduct of the Business as heretofore conducted by the Company" and that the "Assets" as defined in the MUPA, "(a) constitute all of the properties and assets used or held for use in the conduct of the Business as heretofore conducted by the Company, and (b) are sufficient in all material respects for the conduct of the Business as currently conducted."[264]

The Trial record supports that Oracle's representations were true and correct when made. Aluminum acknowledges that when it acquired the Mill, Aluminum bought an ongoing business.[265] As testimony indicated, the ongoing business operated as follows: pre-closing, annealing racks were used to anneal aluminum at the Mill, the annealed aluminum (the final product) was shipped on the annealing racks to the Packaging Division approximately 10 miles away from the Mill, and, as the Packaging Division used the foil and emptied the racks, the empty racks were shipped back to the Mill.[266]

This situation was known and necessary.[267] Alpha needed to continue to ship product to Oracle and LLFlex. Oracle's representations in MUPA Section 4.10 and 4.12 reflect that understanding, and that the parties intended and contemplated for this process to continue post-closing as the business was then "currently" and "heretofore conducted." No evidence at Trial showed that the annealing racks were owned, prior to the MUPA, by anyone other than Oracle.

At the time of the transaction, Oracle and the Mill continued to be reliant upon each other. Mr. Hughes testified that if "[the Mill] got problems and we [Oracle] don't get a supply,

---

[264] JX 1, § 12.
[265] Plaintiff's Trial Brief at 9.
[266] Trial Tr. III at 219-20; Trial Tr. IV at 71-72.
[267] Pappalardo Depo. Trans. at 52-53.

41

then we've [Oracle] got problems."[268] Oracle and LLFlex were the Mill's biggest customer, together purchasing 79% of the Mill's output, and the Mill was Oracle's largest supplier, supplying Oracle with two-thirds of its volume. Oracle was "very dependent on that supply."[269] Additionally, Oracle continued to provide Alpha with essential financial and other services pursuant to the Transition Services Agreement.[270] The parties were to continue doing business together in this fashion for at least nine months post-closing. To that end, the delivery of product post-closing was directly addressed in the PSA:

> 13. PACKAGING. The Seller shall properly pack, mark and ship the Products as instructed by the Buyer and in accordance with existing practices . . ..[271]

The agreements reflect the intent to continue operating the business in the same manner pre- and post-closing, and that the business, including the transfer of racks. Moreover, this would continue over the nine-month transition period post-closing when LLFlex would go to new sources and Alpha would produce new products.[272] Mr. Squatrito testified that Oracle would not have entered into a transaction that would have required it to completely change the manner in which business was previously conducted.[273]

In addition, Oracle encouraged Alpha to stop shipping product on annealing racks and to implement alternatives, even shipping free crates to the Mill to use for shipping product to Oracle.[274] Alpha could have expedited the return of the annealing racks, and had all annealing racks back at the Mill within a matter of one to two months; however, Alpha chose to continue shipping to Oracle on racks.[275]

---

[268] Trial Tr. IV at 74.
[269] JX 14 at Alum012664; Trial Tr. III at 84; Trial Tr. IV at 111.
[270] TSA, JX 1 at MUPA0064-84.
[271] JX 1 at MUPA0090.
[272] Trial Tr. III at 237; Trial Tr. IV at 9-10.
[273] Trial Tr. III at 231-33.
[274] JX 15, 16, PX 149, 150, DX 537; Trial Tr. III at 226; Trial Tr. IV at 76-77, pdf. 909-10.
[275] Trial Tr. at 29; Trial Tr. IV at 84; JX 15.

### b. The Jack White Services Claim

The Court finds that Aluminum failed to prove by a preponderance of the evidence, that LLFlex breached MUPA Section 4.12 as to Jack White's services. Aluminum contends that Oracle breached Section 4.12 by failing to provide Mr. White's services as required under the TSA. The MUPA does not contain such an obligation. The MUPA obligates Oracle to deliver a signed Transition Services Agreement, the TSA, in favor of Alpha.[276] The evidence demonstrates that Oracle delivered the TSA to Alpha.

The obligation to provide "the full-time services of Jack White, Director of Sales – Metals, in a manner consistent with the normal duties, responsibilities and authority implied by such position" for a period of nine months, arises solely from the TSA. The parties to the TSA are Oracle and Alpha. Aluminum is not a party to the TSA. The MUPA does not obligate Oracle to provide, or guaranty that Oracle will provide to Aluminum, Mr. White's services. Aluminum did not sue for breach of the TSA because Aluminum is not a party to that agreement.

The Trial evidence demonstrates that Oracle's representations and warranties under MUPA Section 4.12 were true and accurate. "The Assets, together with the services provided under the Transition Services Agreement, (a) constitute[d] all of the properties and assets used or held for use in the conduct of the Business as heretofore conducted by the Company, and (b) are sufficient in all material respects for the conduct of the Business as currently conducted." That representation was true and correct. Oracle provided all it was required to provide. It was Plaintiff that was not equipped to run the Mill.

### c. Causation Issues

---

[276] JX 1, § 3.2(e).

Aluminum also has a problem with causation. The Court finds that Aluminum failed to carry its evidentiary burden that a breach, if any, by Oracle of MUPA Sections 4.10 and 4.12 caused Aluminum's alleged damages.

The Trial evidence demonstrates that, even with 600 annealing racks and Mr. White's "full time" services, Aluminum (Alpha) most likely lacked sufficient capital, raw material, and quality product to succeed. Under Alpha's ownership, the Mill experienced service and quality issues. As such, the Mill's failure cannot be solely attributed to lack of sales efforts by Mr. White or availability of annealing racks.[277]

As previously discussed, Aluminum was also undercapitalized. Without sufficient capital, Alpha's business plan for the Mill was not attainable. Alpha had difficulty obtaining raw materials and that affected the Mill's ability to produce product.[278]

Alpha needed to address quality and supply issues that had harmed customer relationships, the Mill could not generate new business or repair damaged customer relationships.[279] The Trial evidence demonstrated that these same problems persisted throughout the post-MUPA period.[280] With this, the Court finds that Aluminum cannot prove by a preponderance of the evidence that any breach relating to the annealing racks and/or Mr. White's services was the cause of Aluminum's damages.

d.      **Aluminum Failed to Prove Intentional Misrepresentation or Fraud.**

Aluminum contends that the LLFlex acted fraudulently or made material misrepresentations and MUPA Section 7.4(i) applies. The Court has heard the evidence at Trial

---

[277] Trial Tr. IV at 203.
[278] DX 544; DX 542; DX 550; DX 555; DX 549; DX 571.
[279]Trial Tr. IV at 183-84; Trial Tr. IV at 193;  Trial Tr. III at 242-43.
[280] DX 529; DX 535; DX 538; DX 549; DX 551; DX 553; DX 556; Trial Tr. IV at 166-76; Trial Tr. IV at 200.

and finds that Aluminum failed to prove Oracle, or LLFlex, committed fraud or made intentional misrepresentations.

MUPA Section 7.2 provides, in certain circumstances, for the indemnification of Aluminum by Oracle.[281] MUPA Section 7.4 limits the parties' indemnification claims.[282] MUPA Section 7.4(i) provides that:

> (i) Notwithstanding anything to the contrary herein, none of the restrictions, limitations, caveats or qualifications in [the MUPA] shall limit any Person's rights, whether substantively or procedurally, with respect to recovery or other remedial relief in respect of intentional misrepresentation or fraud.[283]

The Court finds that the record does not support the conclusion that Oracle (or LLFlex) made any intentional misrepresentation or committed fraud. The MUPA was negotiated by experienced parties that were represented by experienced counsel. The allegations about annealing racks, Mr. White's services and Grant Thornton are contractual disputes and not instances of fraud or alike.

The Court did not find support for Aluminum's contention that Oracle intentionally "withheld" annealing racks and never took "corrective action."[284] Oracle had a business interest in maintaining a relationship with Alpha and the Mill. Purposefully withholding the racks just does not serve the interests of Oracle. This has been discussed in depth above. The same is true as to Mr. White's services. The reality is Mr. White difficulty is selling the Mill's products due to supply and quality. While everything did not go as planned with the racks and Mr. White, the record does not support that LLFlex committed fraud or intentionally misrepresented anything.

---

[281] JX 1, § 7.2.
[282] JX 1, § 7.4.
[283] JX 1, § 7.4(i).
[284]*See* SAC ¶¶ 45, 100; Alum. Trial Br. at 22, 43.

Aluminum therefore failed to demonstrate, by a preponderance of the evidence, that Oracle breached Section 4.10 and 4.12 of the MUPA, much less with an illicit state of mind or with fraudulent intent.

## C. ALUMINUM'S CLAIMS REGARDING ARBITRATION DO NOT SUPPORT A CLAIM.

The Court finds that Aluminum's contention that it is entitled to damages because Oracle made it "impossible" to arbitrate and engaged in "faux" settlement negations[285] is not supported by the evidence. Aluminum claims that Oracle should have known Grant Thornton, the agreed-upon arbitrator in the MUPA, would have a conflict of interest on the seller side. The Court finds that the evidence does not support a finding that Oracle acted in bad faith in selecting Grant Thornton, forced the parties to select Grant Thornton as the arbitrator, or even knew that Grant Thornton would not act due to a conflict.

Grant Thornton declined to act as arbitrator based upon an audit relationship with another portfolio company of Centre Lane Partners,[286] which was remote and unknown to Oracle.[287] After interviewing and discussing alternatives, the parties searched for an alternative arbitrator, a process in which Oracle was very active.[288] The parties ultimately agreed to use Anchin as an arbitrator for the Net Working Capital dispute.[289] Although Oracle was ready to proceed to arbitration with Anchin, Aluminum failed to sign Anchin's engagement letter or pay the retainer, and failed to respond to inquiries relating thereto, ultimately abandoning the process.[290]

As for settlement of the purchase price adjustment dispute, Mr. Squatrito credibly testified that Oracle wanted to resolve the dispute with Aluminum, and that Oracle participated

---

[285]*See* Alum. Trial Br. at 4-41.
[286]*Id.* Oracle was owned in part by an investment fund affiliated with Centre Lane Partners, a private equity firm based in New York.
[287] Trial Tr. IV at 57.
[288] PX 196, 197.
[289] PX 200.
[290] DX 590.

46

in settlement negotiations in good faith.[291]  The evidence shows that the parties actively engaged in settlement discussions for several months.

Oracle balked after Accord, an entity to whom Alpha had factored its receivables, made a demand that Oracle pay the outstanding receivables to Accord.[292]  The terms of the proposed settlement, however, required Oracle to pay those same receivables to Alpha.[293]  These competing demands caused a stalemate.[294]  The failure to settle the purchase price adjustment was not due to bad faith but rather timing issues and the circumstances.

### D.  THE COUNTERCLAIM—BREACH OF CONTRACT

LLFlex asserts a claim for indemnification, the Counterclaim.  Oracle did not send a formal Claim Certificate as defined by the MUPA within the Survival Period.  Consistent with the Court's decision above, the Court will enforce the strict requirements of the indemnification procedures and find in favor of Aluminum on the Counterclaim.  Constructive or actual notice does not control over the clear terms of the MUPA.

---

[291] Trial Tr. IV at 17.
[292] Trial Tr. IV at 21.
[293] Trial Tr. IV at 21-22.
[294] *See id.*

**IV.     CONCLUSION**

For the reasons set out above, the Court enters judgment in favor of LLFlex on Count I and Count II.  Except, as set forth above, that the Court will award Aluminum a purchase price adjustment of $362,912.

In addition, the Court enters judgment in favor of Aluminum on the Counterclaim.

Dated: March 16, 2023
Wilmington, Delaware

*/s/ Eric M. Davis*
Eric M. Davis, Judge

cc:  File&ServeXpress